## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

**DONALD RAY WACKERLY, II**,               )
                                           )
                               Petitioner, )
                                           )
vs.                                        )               Case No. CIV-01-567-FHS-KEW
                                           )
**MARTY SIRMONS**, Warden, Oklahoma        )
State Penitentiary,                        )
                                           )
                               Respondent. )

## OPINION AND ORDER

Petitioner, Donald Ray Wackerly, II, was convicted following a jury trial of First Degree Felony Murder and First Degree Robbery, in the District Court of Sequoyah County, State of Oklahoma, Case No. CF-96-349.  As to the count of First Degree Murder, the jury found two aggravating circumstances: 1) that the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution; and 2) the existence of a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society.  In accordance with the jury's verdict, Petitioner was sentenced to death on the murder count and to life imprisonment on the robbery count.  On direct appeal, the Oklahoma Court of Criminal Appeals affirmed his conviction and death sentence.  *Wackerly v. State*, 12 P.3d 1 (Okla. Crim. App. 2000), *cert. denied*, *Wackerly v. Oklahoma*, 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001).

On May 25, 2000, Petitioner filed an Application for Post-Conviction relief in the Oklahoma Court of Criminal Appeals, Case No. PC-2000-350. On October 16, 2000, in an unpublished opinion, that court denied relief. Petitioner now seeks relief from his death sentence pursuant to 28 U.S.C. § 2254.

As a preliminary matter the Court notes that Marty Sirmons is currently the Warden at Oklahoma State Penitentiary. The Court finds, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Marty Sirmons is the proper substituted Respondent and the Court Clerk shall be directed to note such substitution on the record.

## I. RECORDS REVIEWED

This Court has reviewed (1) the Petition for Writ of Habeas Corpus and Appendix thereto; (2) the Response to the Petition filed by the State of Oklahoma; (3) the Reply to the Response filed by Petitioner; (4) transcript of Arraignment held on December 19, 1996; (5) transcript of Preliminary Hearing held on February 10, 1997; (6) transcript of District Court Arraignment held on March 30, 1997; (7) transcript of Motion Hearing held on August 20, 1997; (8) transcript of Motion Hearing held on September 15, 1997; (9) transcript of Motion Hearing held on November 13, 1997; (9) transcript of Arraignment held on March 30, 1997; (10) transcript of Motion Hearing held on January 15, 1998; (11) transcript of Motion Hearing held on April 2, 1998; (12) transcript of Jury Trial beginning on April 20, 1998; (13) transcript of Formal Sentencing held on May 11, 1998; (14) transcript of Evidentiary Hearing held on June 24, 1999; and (13) all other records before the Oklahoma Court of Criminal Appeals which were transmitted to this court, including the Brief filed on Petitioner's behalf

with the Oklahoma Court of Criminal Appeals in both the direct appeal and the post-conviction appeal, as well as other miscellaneous pleadings. Although not listed specifically, this court has reviewed all other items filed in this case. See Inventory of State Court Record, Docket No. 13, filed on June 2, 2002.

As a result, this court finds that the records, pleadings and transcripts of the state proceedings provide all the factual and legal authority necessary to resolve the matters in the petition and, therefore, an evidentiary hearing is unnecessary. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)(*Sumner I*); *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982)(*Sumner II*).

## II. STATEMENT OF THE FACTS

Historical facts found by the state court are presumed correct, unless the petitioner rebuts the same by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Since Petitioner has failed to rebut the facts, as set forth by the Oklahoma Court of Criminal Appeals, this Court hereby adopts the factual findings made by the Oklahoma appellate court.

> On the afternoon of September 7, 1996, [Petitioner] and his wife, Michelle Wackerly, drove to a lock and dam area near Muldrow. They were looking for a person to rob and kill. The preceding night, [Petitioner] had told his wife that they needed money and he was going to do whatever it took to get it. As he said this, [Petitioner], wearing latex gloves, loaded his rifle. When they were driving around the following afternoon, they saw a blue Toyota pickup parked by a levy and an Asian man fishing on the other side of the levy. [Petitioner] parked his Jeep by the blue pickup and Michelle got out and walked around to look for other people in the area. Seeing none, she approached the man and spoke to him for about five minutes. She then went back to where the vehicles were parked. After forty-five minutes the man

came back over the levy carrying his fishing gear. [Petitioner] had raised the hood of his Jeep and asked the man if he had jumper cables to give him a jump. Knowing what was going to happen, Michelle knelt down behind the Jeep. She heard seven or eight gun shots and a thump. When she walked back around the Jeep, she saw that the man was in the bed of his pickup and [Petitioner] was trying to pull a fishing pole out from under him. Michelle heard the man still trying to breath. [Petitioner] drove the man's truck to another location where he drove it into the water. Along the way he threw some of the man's fishing poles into a wooded area. He kept the man's reels and a tackle box. A couple of days later, [Petitioner] took the reels to Rocky's Pawn Shop in Roland. He kept the tackle box.

Around 12:30 a.m. on September 8, 1996, while Dennis Butler and his nephew, Rodney, were four-wheeling near a dam on the Arkansas river, they came upon a truck that was partially submerged in the water. A body was lying in the truck bed. They went back to Rodney's house and called the sheriff's department to report what they had seen. Dennis and Rodney escorted law enforcement officers to the truck where subsequent investigation revealed that Pan Sayakhoummane had been shot and was dead in the bed of the truck.

The investigation led to no suspects in this case until several months later. In December of 1996, Michelle Wackerly, [Petitioner's] then estranged wife, along with her attorney, met with OSBI agents Franchini and Page. Michelle told the OSBI agents what had happened and she took them to where the murder had occurred. Pursuant to Michelle's information, agents retrieved fishing reels from Rocky's Pawn Shop. The owner of the shop confirmed that [Petitioner] had pawned the reels. [Petitioner's] apartment was searched and the search revealed, among other things, a .22 rifle, a box of ammunition with some bullets missing, some latex gloves, and the victim's tackle box. Michelle also directed the agents to the fishing poles [Petitioner] had thrown from the victim's truck into the woods.

*Wackerly v. State*, 12 P.3d 1, 6-7 (Okla. Crim. App. 2000).

Additional facts will be discussed as they become relevant.

# III.  PETITIONER'S CLAIMS FOR RELIEF

In his Petition for Writ of Habeas Corpus filed herein on May 7, 2002, Petitioner raises eight (8) grounds for relief.  On August 7, 2002, Respondent filed a Response to the Petition for Writ of Habeas Corpus by and through the Attorney General of the State of Oklahoma.  On September 13, 2002, Petitioner filed a Reply to the Response.  Petitioner's alleged errors can be summarized as follows: (1) ineffective assistance of counsel during both stages of trial; (2) the evidence was insufficient to support the "continuing threat" aggravating circumstance; (3) the "continuing threat" aggravating circumstance is unconstitutionally vague; (4) the evidence was insufficient to support the "avoid lawful arrest" aggravating circumstance and this aggravator is unconstitutionally broad as applied to Petitioner's case; (5) an impartial jury deprived Petitioner of his rights under the Sixth and Fourteenth Amendments; (6) there was insufficient evidence to support Petitioner's conviction for First Degree Murder; (7) the evidence was insufficient to support Petitioner's conviction for Robbery with a Firearm; and (8)  the cumulative effect of the above listed errors deprived Petitioner of his constitutional right to due process of law and a reliable sentencing hearing.

# IV.  STANDARD OF REVIEW

Since Petitioner filed his petition in May, 2002, this case is governed by the statute as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA).  See *Lindh v. Murphy,* 521 U.S. 320, 326-327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The AEDPA made significant changes to federal habeas corpus law, specifically delineating the circumstances under which a federal court may grant habeas relief. Under the AEDPA's provisions, this Court is precluded from granting habeas relief on any claim adjudicated on the merits by a state court

> unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Furthermore, determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court interpreted the above-quoted statute holding, in order for a petitioner to obtain federal habeas relief, the petitioner must first demonstrate that his case satisfies the conditions set by § 2254(d)(1). In interpreting the "contrary to" language of the statute, the Court said the text of § 2254(d)(1) "suggests that the state court's decision must be substantially different from the relevant precedent of this Court." *Id.*, U.S. at 405, S.Ct. at 1519. The Court went on to hold that a state-court decision will be contrary to clearly established precedent "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court case law or "if the state court confronts a set of facts that are materially indistinguishable from" a decision of the Supreme Court, but nonetheless arrives

at a different result. *Id.*, U.S. at 406, S.Ct. at 1519-1520. In considering the "unreasonable application" language of the statute, the Court held when "a state-court decision unreasonably applies [Supreme Court law] to the facts of the prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's "unreasonable application" clause." *Id.*, U.S. at 409, S.Ct. at 1521. Finally, the Court went on to say: "Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*, U.S. at 411, S.Ct. at 1522.

The AEDPA "increases the degree of deference afforded to state court adjudications." *Moore v. Gibson*, 195 F.3d 1152, 1164 (10th Cir. 1999), *cert. denied*, *Moore v. Oklahoma*, 530 U.S. 1208, 120 S.Ct. 2206, 147 L.Ed.2d 239. Determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner first contends he was denied his constitutional right to effective assistance of counsel. Specifically, Petitioner asserts trial counsel was ineffective for (1) failing to investigate, discover and present to the jury substantial mitigating evidence during the sentencing phase of trial; (2) failing to adequately voir dire potential jurors; and (3) failing to protect Petitioner's right to be tried by an impartial jury by not challenging for cause two

potential jurors. Respondent argues, based on the facts of this case, habeas relief is not warranted on the first allegation. As to the second and third contentions, Respondent asserts Petitioner has failed to establish that the Oklahoma Court of Criminal Appeals adjudication of these issues was unreasonable and, therefore, habeas relief should be denied.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court enunciated the legal standards which apply to claims of ineffective assistance of counsel in a criminal proceeding. First, the Court indicated that the defendant must establish that the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms. In order to establish that counsel's performance was deficient, Petitioner must establish counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*., U.S. at 687, S.Ct. at 2064. The purpose of the Sixth Amendment's guarantee of effective assistance of counsel is to ensure that criminal defendants receive a fair trial. *Id.*, U.S. at 689, S.Ct. at 2065. Second, the defendant must establish that the deficient performance prejudiced the defense. *Id.*, U.S. at 687, S.Ct. at 2064. Failure to establish either prong of the *Strickland* standard will result in a denial of Petitioner's Sixth Amendment claims. *Id.,* U.S. at 696, S.Ct. at 2069-2070.

While ensuring that criminal defendants receive a fair trial, considerable judicial restraint must be exercised. As the Supreme Court cautioned in *Strickland*,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining

8

counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.*, U.S. at 689, S.Ct. at 2065 (citations omitted).

In deciding whether counsel was ineffective, a court must judge the reasonableness of the challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. It is the responsibility of a defendant attacking an attorney's assistance to identify the particular acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment and then the court must determine, in light of all of the circumstances, whether the identified acts were outside the wide range of professionally competent assistance. *Id.*, U.S. at 690, S.Ct. at 2066. Courts are free to address the performance and prejudice components in any order and need not address both where a defendant fails to make a sufficient showing of one. *Id.*, U.S. at 697, S.Ct. at 2069.

## A. Failure to Investigate, Discover, and Present to the jury substantial mitigating evidence during the sentencing phase of trial

While the failure to present available mitigating evidence is not *per se* ineffective assistance of counsel, reviewing courts must evaluate the reasons for counsel's failure to

present mitigating evidence and then decide whether the failure, if due to an attorney's deficient performance, prejudiced the defendant. *Hale v. Gibson*, 227 F.3d 1298, 1314 (10th Cir. 2000) (quoting *Breechen v. Reynolds*, 41 F.3d 1343, 1366-1368 (10th Cir. 1994). Here, Petitioner contends, due to severe time constraints, counsel failed to conduct more than a cursory mitigation investigation.

One of counsel's basic obligations is make the adversarial testing process work. Since this testing process generally can not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, the Supreme Court has indicated a defense attorney "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, *supra*, U.S. at 691, S.Ct. at 2066. *See also, Stouffer v. Reynolds*, 168 F.3d 1155, 1167 (10th Cir. 1999). A reasonable investigation includes an investigation of the defendant's background, for possible mitigating evidence. *Breechen*, *supra*. In a capital case, this duty is strictly observed. *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997).

In addition to the litany of ineffective assistance of counsel claims raised during his direct appeal, Petitioner requested an evidentiary hearing asserting three additional claims which he contended were supported by evidence not in the record but which was available to defense counsel at the time of trial. One of the claims on which Petitioner requested this evidentiary hearing was "counsel's failure to investigate and present available evidence which would have warranted different verdicts and sentences in the first and second stages of trial." *Wackerly*, *supra* at 13. In denying Petitioner's request for an evidentiary hearing,

the Oklahoma Court of Criminal Appeals found Petitioner "has shown this Court that trial counsel could perhaps have accessed other information in preparing for trial. However, [Petitioner] has not shown by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize or identify the complained-of evidence." *Id.*, at 14.

A. Performance

Without a doubt, the sentencing stage of a death penalty case is the most critical. Thus, the importance of mitigation evidence can not be overemphasized. To perform adequately in a capital case trial counsel must perform a painstaking search for mitigating evidence. The Tenth Circuit has described the importance of mitigation evidence in a capital trial as follows:

> While cognizant of the heavy presumption of reasonableness we must afford trial counsel's actions, we are also conscious of the overwhelming importance of the role mitigation evidence plays in the just imposition of the death penalty. The presentation of mitigation evidence affords an opportunity to humanize and explain-to individualize a defendant outside the constraints of the normal rules of evidence. Indeed, in capital cases, where the need for individualized sentencing is most critical, the right to present mitigating evidence to the jury is constitutionally protected. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1512-13, 146 L.Ed.2d 389 (2000). *See also Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases."). We are therefore compelled to insure the sentencing jury makes an individualized decision while equipped with the "fullest information possible concerning the defendant's life and characteristics," and must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence. *Lockett*, 438 U.S. at 603, 98 S.Ct. 2954 (quoting *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)).

*Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000). Counsel's conduct clearly fell below the standards for capital defense work articulated by the American Bar Association - standards which the Supreme Court has long referred to as "guides to determining what is reasonable." *Strickland, supra*, U.S. at 688, S.Ct. at 2065.

> The ABA Guidelines provide that investigation into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989).

*Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 2537, 156 L.Ed.2d 471 (2003).

In this case, Petitioner submits two affidavits from trial counsel in which both attorneys, Steven D. Hess and Larry W. Tedder, indicate they were appointed on March 12 and 13, 1998, respectively, and entered their appearances on March 25, 1998. Simultaneous to entering their appearances, counsel filed a Motion for Continuance of Trial in which counsel indicated they had not had adequate time to conduct witness interviews or prepare for the guilt or penalty phase of trial. O.R. 159-161. Although counsels' affidavits indicate, despite diligent efforts, they were not able to adequately prepare for either stage of trial, the affidavits reflect counsel specifically needed additional time to gather mitigation evidence, *i.e.* "school records, medical records, information about Mr. Wackerly's head injuries, depression, suicide attempts, and drug addiction." Apps. III and IV. Counsels' affidavits also indicate their investigator did not have the time to gather the information needed.

Although the state does not attempt to rebut defense counsels' affidavits, according to the state court records, the Oklahoma Indigent Defense System (hereinafter OIDS) was

appointed on December 19, 1996, to represent the petitioner. Jim Bowen, with OIDS, Capital Trial Division in Tulsa, Oklahoma appeared at: (1) petitioner's arraignment on December 19, 1996; (2) the preliminary hearing held on February 10, 1997; (3) district court arraignment on March 30, 1997; (4) a motion hearing on August 20, 1997, in which another attorney, Lance Hopkins, also appeared; (5) a motion hearing on September 15, 1997, in which Bowen requested a continuance; and (6) a motion hearing on November 13, 1997, in which Bowen requested that OIDS, Tulsa office be allowed to withdraw due to a conflict of interest. *See also*, Motion to Withdraw (O.R. 132- 134). The Court granted OIDS request and, since the matter was set for trial on December 1, 1997, the Court indicated it would reset the trial for the February or March docket. Tr. of Motion Hearing held on November 13, 1997. *See also*, Order Granting Motion to Withdraw (O.R. 135).

Thereafter, on January 15, 1998, Wesley Gibson, with OIDS, Capital Trial Division in Norman, Oklahoma filed a motion on behalf of Petitioner.[2] At a scheduling hearing on January 15, 1998, based on a defense motion to test the state's ballistics evidence, the court continued the trial to the April docket stating, in part:

> We've kind of had -- started out with the Tulsa department, and then they determined or assumed they had a conflict. Now it's back with the Norman division. As I said in chambers, without sounding to be smart, I don't care who tries it, meaning Tulsa or Norman. I do care, and I do insist, and the Court's going to take the hard nose approach that this matter is going to be heard on the April docket. Will be first up, first to go.
> So, whatever needs to be done by and through communications with the district attorney's office and/or your office in Tulsa, I don't care who tries it.

---

[2]The state court records reflect Mr. Gibson never filed an entry of appearance in this case; but simply began filing pleadings on Petitioner's behalf on January 15, 1998, including, in part, a motion to continue the trial. O.R. 137 - 143.

We're going to try it. This will be the last continuance for any reason as far as not having evidence. . . . . . . .

I can't tell you what day in April. It's safe enough to say the April docket, which I think is toward the first part of April. . . . . .

Tr. of Motion Hearing held on 1/15/98, at p. 8.

On March 6, 1998, the court entered an order setting all pre-trial motions for hearing on March 12, 1998. O.R. 153. The court's minutes from March 12, 1998, reflect the state appeared by D. Dowty, but an OIDS attorney was not present. At that time, the Court advised the parties that the case would be tried on April 20, 1998 at 9:00 o'clock a.m. and that no continuances would be granted. O.R. 154.

Thereafter, on March 25, 1998, Steven D. Hess (OIDS attorney) and Larry Tedder (contract co-counsel) filed a pleading entitled Substitution of Counsel[3] and a Motion for Continuance of the April trial date.[4] In denying counsels' motion for continuance, the trial court judge said:

I can appreciate your request [for continuance]. Of course, I think again maybe from a selfish standpoint I think the Court has been very lenient in the past as to continuances. I've always tried to make sure that Mr. Wackerly was before the Court. I've tried to be as fair as possible.

Maybe from a selfish standpoint, the Court has set aside specifically, and I've ordered an additional number of jurors for this case. I know that it may come as a surprise to you because of you getting into it, but the system itself has well been apprised of this for quite some time. Based on that, I'm going to deny your request for a continuance, grant an exception to that. Set this matter for trial April 20 at 9:00 a.m. . . . . .

---

[3]O.R. 155 - 158.

[4]O.R. 159 - 165. Nothing contained within the state court records indicates the number of investigators which were assigned by OIDS to this case from December 19, 1996, until April 20, 1998.

Tr. of Motion Hearing held on April 2, 1998, at pp 10-11.

Despite counsels' statements they did not have enough time to conduct an adequate investigation, OIDS had approximately sixteen (16) months to get ready for trial in this case. Instead of holding an evidentiary hearing, the Oklahoma Court of Criminal Appeals simply found Petitioner failed to establish "by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize or identify the complained-of evidence." *Wackerly v. State*, 12 P.3d 1, 14 (Okla. Crim. App. 2000). The State argues the state appellate court's rejection of this claim was "wholly reasonable in light of *Strickland* and the extra-record evidence marshaled by Petitioner on appeal;" then the State continues by focusing solely on Petitioner's failure to establish prejudice. Response to Petition for Writ of Habeas Corpus at p. 12. In *Strickland*, however, the Supreme Court made it clear that "thorough investigations[s]" are "virtually unchallengeable" while underscoring counsel's "duty to make reasonable investigations." *Id.*, 466 U.S. at 689-691, 104 S.Ct. at 2052. The question in this case, like that in *Anderson v. Sirmons*, --- F.3d ---, 2007 W.L. 521173, *12 (10th Cir. 2007), "is not whether trial counsel made a tactical or strategic decision not to include the omitted mitigation evidence at trial, but rather whether 'the investigation supporting counsel's decision . . . *was itself reasonable.*'" *Wiggins*, 539 U.S. at 523. Clearly, where the record indicates counsel failed to investigate areas such as educational records, medical records, or psychological evaluations,[5] this Court finds Petitioner has

---

[5]Counsel's affidavits, which were never rebutted, specifically indicate "I needed additional time to gather: school records, medical records, information about Mr. Wackerly's head injuries, depression, suicide attempts, and drug addiction." Apps. III and IV, at ¶ 9. Both of counsel's affidavits conclude: "My failure to investigate all these areas was not due to a

established that counsel's failure to pursue reasonable avenues of investigation without any idea of what the investigation might reveal was not an informed strategic decision. *Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (10th Cir. 2002). Therefore, to the extent the state appellate court found Petitioner had not met his burden to establish counsel was ineffective for failing to identify the complained-of evidence, this Court finds the Oklahoma Court of Criminal Appeals decision that counsel's conduct did not rise to the level of ineffective assistance of counsel to be contrary to clearly established Federal law as determined by the Supreme Court.

---

strategic decision on my part. Rather, it was due to the fact that I had an inadequate amount of time to prepare for trial." *Id.*, at ¶ 13.

2. Prejudice

Before counsel's inadequate performance will be deemed a Sixth Amendment violation, Petitioner must establish that counsel's inadequate investigation prejudiced his defense. *Wiggins*, *supra*, U.S. at 534, S.Ct. at 2542 (quoting *Strickland*). In assessing prejudice during the sentencing phase of trial, this Court must be mindful of the strength of the government's case and the aggravating factors found by the jury as well as the mitigating factors which might have been presented if counsel's performance had not been deficient. *Stafford v. Saffle*, 34 F.3d 1557, 1564 (10th Cir. 1994). A reviewing court must "evaluate the totality of the available mitigating evidence--both that adduced at trial, *and the evidence adduced in the habeas proceedings[s]* in reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (emphasis added). Accordingly, the issue this Court must decide is: If all of the mitigation evidence which Petitioner claims his attorney should have discovered and presented to the jury had been presented, is there a reasonable probability, in light of the aggravating factors found by the jury, the jury would have spared Petitioner's life?

The facts of this case, set forth in section II above, accurately reflect the basic facts surrounding the murder of Pan Sayakhoummane which were adopted by the State in the second stage of trial. J.T.Tr., at pp. 533-534. Additional facts, however, are significant when considering all of the evidence in aggravation.

Specifically, the unrefuted testimony established Petitioner and his wife, Michelle Wackerly, talked about killing someone the night before the murder and Petitioner had gotten

17

out a .22 rifle and loaded it. *Id.*, at pp. 305 - 306. Before loading the weapon, Petitioner put on latex gloves and he rubbed the bullets off with a towel. *Id.*, at p. 307. The next day, Petitioner and his wife drove down to the lock and dam in Muldrow and began looking for a person to rob because they needed money. *Id.*, at p. 306. Once at the lock and dam area, Michelle went to the victim's location on the river and made sure no one else was around besides the victim while Petitioner searched through the victim's truck. *Id.*, at p. 308 - 309. After laying in wait for the victim to return to his truck for at least forty-five (45) minutes, Petitioner propped the hood up on his vehicle and asked the victim if he had some jumper cables. *Id.*, at p. 309 - 310. When the victim approached, Petitioner shot him. *Id.*, at p. 310 - 311. Petitioner then loaded the victim into the back of the victim's pickup and drove the victim's pickup down into a wooded area where he stole the reels off of the victim's fishing poles, the victim's tackle bag and billfold. *Id.*, at pp. 311 - 318. Petitioner drove the victim's truck down a dirt road and into the Arkansas river. *Id.*, at pp. 315 and 231. Following this callous murder, Petitioner and his wife went to Sonic to get something to eat. *Id.*, at p. 316.

Aside from Petitioner's wife's testimony directly linking Petitioner to the senseless murder of Pane Sayakhoummane, significant corroborating evidence tied Petitioner to the murder. First, just two days after the murder, Petitioner pawned some of the victim's fishing reels to Rocky's Pawn Shop in Roland. *Id.*, at pp. 318, 363 - 366 and State's Exhibit 19A. Second, in addition to Michelle Wackerly's testimony that "she heard seven or eight gun shots and a thump," Dr. Ronald F. Distefano, Chief Medical Examiner testified he performed the autopsy on the body of Pan Sayakhoummane and based upon his examination of the

18

body, a minimum of seven shots were fired.  *Id.*, at 441.  Dr. Distefano further indicated there were "possibly up to four more" shots which were fired.  *Id.*  Although Dr. Distefano could not determine the order of any of the wounds suffered by the victim, Dr. Distefano testified the cause of death was multiple gunshot wounds of the chest and head.  *Id.*, at p. 444 - 445.  *See also*, State's Exh. No. 29.  The State also presented evidence that Petitioner had confessed to killing an Asian guy near the lock and dam.  *Id.*, at pp. 391 - 397.

Fishing poles were found in the woods where Michelle Wackerly had indicated Petitioner had discarded the victim's fishing poles.  *Id.*, at pp. 341 - 343, 367 - 372 State's Exh. Nos. 16, 17, 27 and 28.  A Marlin .22 caliber rifle with a sawed off stock was found in the closet of Petitioner's master bedroom.  State's Exh. Nos. 12 and 20.  A box of .22 ammunition with some missing was found in the kitchen drawer of Petitioner's apartment.  State's Exh. No. 21.  A fishing bag identified as belonging to the victim was found in Petitioner's apartment.  State's Exh. Nos. 22 and 23.  A box of latex gloves were also recovered from Petitioner's apartment.  State's Exh. No. 26.

Further, Ronald Jones, a firearm and tool mark examiner employed by the O.S.B.I. testified he performed comparison microscope testing on the projectiles removed from the victim's body with the Marlin rifle recovered from Petitioner's apartment.  While Mr. Jones was not able to positively identify the projectiles nor eliminate the projectiles  as coming from the Petitioner's rifle, he testified the markings on the bullets were consistent with having been manufactured by Marlin.  *Id.*, at pp. 453-454.  Additionally, Mr. Jones testified he treated a ball cap recovered from Petitioner's apartment with certain chemicals to

ascertain the presence of lead residue.  The cap contained lead residue.  According to Mr. Jones, based upon his testing of the Marlin rifle, the rifle would have left residue only if the muzzle of the rifle were within 12 - 18 inches of the target.  *Id.*, at pp. 455-456.  Finally, Mr. Jones indicated that the box of Winchester Super X .22 long rifle hollow point ammunition which was recovered at Petitioner's apartment was not inconsistent with the projectiles he examined.  *Id.*, at p. 457.

Next, the State presented evidence that only nine days after this brutal murder, Petitioner and his wife robbed the Hit and Run convenience store in Webber Falls.  In reference to this testimony, the Oklahoma Court of Criminal Appeals made the following factual findings:[6]

> Michelle Wackerly testified that she and [Petitioner] robbed the convenience store.  She stated that they wore masks and each carried a gun. [Petitioner] wore an orange and brown hunting mask.  Colleen Parker testified that she was the clerk at the Hit and Run store in Webber Falls on September 16, 1996, when the store was robbed by two people.  The male was mostly covered and was holding a dark colored gun.  On September 21, 1996, Stigler police stopped a jeep occupied by [Petitioner] and Michelle Wackerly.  A subsequent search of this vehicle revealed an orange face mask and a .22 pistol.  This gun was identified by Colleen Parker as the weapon which [Petitioner] used during the robbery of the Hit and Run.

*Wackerly*, *supra* at pp. 17 - 18.  Additionally, Colleen Parker testified the male robber kept telling her to give up her money.  The third time the robber told her to give up her money, he put the gun between her eyes almost touching her skin.  The robber, who was wearing

---

[6] As stated previously, historical facts found by a state court are entitled to a presumption of correctness, unless the petitioner rebuts the same by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Since Petitioner has failed to rebut the Oklahoma appellate court's factual findings relating to the aggravating circumstances, this court adopts those findings.

gloves with the fingers cut out, asked Ms. Parker if there was anyone else in the store. When

Ms. Parker said "no", the robber took the money turned around towards the door, cocked his

gun and said "I'll kill both of you," then Petitioner ran out of the door.[7] J.T.Tr., at pp. 520 -

522.

Against this aggravating evidence, Petitioner claims counsel should have discovered

and presented "[a] plethora of mitigating evidence."[8] This evidence consists of medical

records, school records, employment records, four affidavits from various people who were

available to testify and/or testified at trial, and a neuropsychology report.

During Petitioner's trial, the jury heard testimony from three defense witnesses during

the sentencing stage of trial. The first witness, Sue Spinas, testified Petitioner was employed

by her, doing farm labor, in 1992 and 1993, and that he was a reliable employee. Further,

Ms. Spinas indicated even though Petitioner had been convicted of robbery and murder, she

would not have a problem with Petitioner working on her farm again. J.T.Tr., at pp. 535-537.

The second witness, Donna Lomax,[9] testified (1) Petitioner was the baby of the family; (2)

Petitioner was very spoiled; and (3) Petitioner never had any limits or boundaries placed

upon him by his parents. As a result, Ms. Lomax felt Petitioner didn't seem prepared for life.

Ms. Lomax further testified Petitioner was the driver in a fatal car accident when he was 14

years old and Petitioner's mother never made Petitioner acknowledge the role he played in

---

[7]Ms. Parker also observed a second robber, who was smaller than the first holding the door open. Ms. Parker could see both hands of the second robber and did not observe any weapon on that person. J.T.Tr., at p. 521.

[8]*See*, Petition at p. 18.

[9]Ms. Lomax is Petitioner's older sister.

the death of another human being.  *Id.*, at pp. 537-539.  Finally, Diana Branham testified her seven (7) year old son[10] was crazy about Petitioner.  Ms. Branham indicated her mother died when Petitioner was 3½ years old and her father remarried Petitioner's mother, Carolyn, approximately a year later.  Petitioner's mother died shortly before Petitioner was arrested on this case.  Ms. Branham asked the jury to spare Petitioner's life.  *Id.*, at pp. 540-544.

Based upon all of this testimony, the jury was instructed that evidence had been introduced as to the following mitigating circumstances:

1. The [petitioner] did not have any significant history of prior criminal activity.
2. The [petitioner] is likely to be rehabilitated.
3. The [petitioner's] emotional/family history.
4. Don Wackerly loves his family.
5. Don Wackerly's family loves him.
6. Don Wackerly was a steady, reliable employee for Sue Spinas.
7. Don Wackerly's execution would have a devastating effect upon his nephew.

In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well.

Instr. No. 10, O.R. 272.

The focal point of the evidence the jury did not hear is the neuropsychological evaluation by Dr. Mickey Ozolins, Ph.D. (App. VI, Exh. M).  According to Dr. Ozolins' report, Petitioner has a "longstanding dependent personality" which is

manifested, in particular, by letting others make his decisions for him . . . Although the [petitioner's] acting out behavior contraindicates the more stereotypical passivity seen in dependent personalities, his aggressive acting out [possibly contributed to by ADHD] probably also reflected, in part, his low self-esteem and his willingness to go to great lengths to impress others with his

---

[10]Ms. Branham is a step-sister of the Petitioner and her son, Derrick, is Petitioner's nephew.

daring and his physical prowess. Such a personality type is likely to be easily led and influenced and to go along, in particular, with his love object, perhaps in this case, being influenced by [his wife]. *Id.*, at p. 7.

Yet, Dr. Ozolins' report makes it clear Petitioner functions in the Average range of verbal intelligence and the Above Average range of nonverbal intelligence. Additionally, the report indicates Petitioner "showed Very Superior planning, organization and graphomotor skills on a complex reconstruction test." While the report indicates petitioner's verbal learning pattern on a paired associates test suggests attentional difficulties," test results relating to Attention/Memory Functions indicate petitioner "has a Superior Memory in both auditory and verbal modalities" and Petitioner scored average and high average on intellectual function tests. *Id.*, at pp. 6-7. Furthermore, although the report indicates Petitioner "had difficulty explaining the meaning of a simple phrase, reflecting Below Average ability to express his ideas," *id.*, at p. 6, Petitioner's school records indicate Petitioner excelled in Oral Communication during his senior year of high school, making his best grade and only "B" for the year in his communication class. App. VI, Exh. E.

Dr. Ozolins' report also indicates Petitioner 1) was raised by his biological parents, and 2) neither of his parents had any psychiatric, drug or alcohol problems. According to the report, both of Petitioner's parents worked. App. VI, Exh. M at p. 2.

Finally, Dr. Ozolins' report reveals Petitioner reported "he was a slow reader," but "he got along well socially in high school" and was "active athletically in baseball, football and golf." *Id.*, at p. 3. Moreover, Petitioner reported using alcohol excessively beginning

in the 10th grade with drug use escalating thereafter until he was using $300 of "crank" per day. *Id.*

In conjunction with the neuropsychological evaluation, Petitioner submits some limited medical records which counsel asserts establish "Mr. Wackerly sustained organic brain damage during his birth." Petition at p. 18. However, these allegations are merely conclusory allegations based upon the facts within the records which reveal forceps were used and Petitioner "was initially very bruised and cyanotic. He also had a hematoma in the right parietal area on his scalp. He also had hypospadias.[11] Face mask was applied after birth, then he was put in a crib with oxygen." See Appendix to Petition for Writ of Habeas Corpus, hereinafter referred to as "App.," at App. VI, Exh. A, medical records from Sparks Memorial Hospital relating to the defendant's birth (footnote added).[12] *See also*, App. VI, Exh. M, Neuropsychology Report of Mickey Ozolins, Ph.D, at pp. 1 - 2. The only other medical records submitted by Petitioner which would have existed at the time of trial are from a Dr. Lange dated January 19, 1987. These records reveal Petitioner visited Dr. John L. Lange, M.D. complaining of venereal warts and dysuria, *i.e.* difficult or painful urination. Based upon what appears to be a one-time visit, a notation was placed on the report stating: "the patient is a highschool student, may be semi-retarded." App. VI, Exh. B.

---

[11]An abnormality of the penis in which the urethra opens on the undersurface. WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 594 (1990).

[12]The last page of the Sparks Memorial Hospital medical records is almost entirely illegible. This Court reviewed the Application for Evidentiary Hearing on Sixth Amendments Claims filed in the Oklahoma Court of Criminal Appeals on August 9, 1999, and found a similar page of this exhibit; but it was not any more legible than the one filed herein.

Petitioner also submits records from the Oklahoma State Penitentiary. During the course of completing a health history form, Petitioner answered affirmatively to the question: "Have YOU ever had or do YOU now have: 1. Periods of unconsciousness; 2. Blurred vision. . . . ." The health care provider made the following comments in reference to Petitioner's responses: 1. "MVA - & Boxing;" 2. "when knocked out (only)." App. VI, Exh. K., at p. 6. These records also reveal Petitioner reported he has chest pain, although he "rarely has deep pain - no radiation." Petitioner further reports sometimes having difficulty breathing. Petitioner denied being on any medications; indicates he has coughed up "dried blood;" and has taken Zantac and Tagamet for stomach problems. Finally, Petitioner reported he had attempted suicide by "hang, shooting, run off cliffs motorcycle"[13] and that he has "anxiety and nervousness." App. VI, Exh. K, at p. 6.

The school records submitted by Petitioner indicate Petitioner was never a very good student. Petitioner did, however, attend school through twelfth grade and later obtained his GED. App. VI, Exh. C, D, E and M.

Petitioner also submits what counsel labels as employment records from Industrial Oils and Dixie Cup. App. VI, Exhs. F and G. The records from Industrial Oils consists of three (3) pages. App. VI, Exh. F. The first page of these records is a letter addressed to Industrial Oils Unlimited of Arkansas, Inc. dated March 7, 1995, acknowledging that a report of injury involving the Petitioner had been received. The letter does not, however, indicate

---

[13]The last page of the Oklahoma State Penitentiary medical records reflect petitioner attempted suicide between the ages of 15 and 20. App. VI, Exh. K.

what type of injury was sustained.  Rather, it reflects Petitioner "lost no time for work due to this injury and the claim will only require the payment of medical expenses."  The second and third pages of Exh. F are nothing more than the medical insurance enrollment forms Petitioner apparently filled out when he began working for Industrial Oils Unlimited.

The employment records from James River-Dixie/Northern Inc. indicate Petitioner began on July 13, 1988 and was discharged on July 29, 1988, because he "required excessive supervision and was slow in learning and retaining instruction."  A letter contained within this exhibit appears to be from petitioner's supervisor which recommends petitioner "not be re-hired in the future."  Additionally, these records indicate, during the 37 days of his employment, Petitioner was "never tardy or absent."  App. VI, Exh. G.

Next, Petitioner submits an affidavit from his sister, Diana Branham.  App. VI, Exh. H.  The affidavit indicates Petitioner cut his head when he was approximately two years old while going underneath a barbed-wire fence and "was treated at the hospital in Sallisaw where he received bandages and/or stitches."  *Id.*, at ¶ 2.  Ms. Branham confirms her family has a history of heart problems - her father (Petitioner's step-father)[14] and uncle, Clark Wackerly, recently died from heart problems.  *Id.*, at ¶ 3.  Ms. Branham reveals Petitioner was a "loving child growing up in our family and was fun to be around."  His mother was, however, a controlling person and overly protective of Petitioner, never requiring "Donald to accept responsibility for any of his actions growing up."  *Id.*, at ¶ 4.  As Petitioner got older "he would threaten to do harm to himself if he did not get his way.  He would start

---

[14]*See* Diana Branham's trial testimony, J.T.Tr. at p. 542.

fights and could never harbor a steady relationship with his peers." *Id*. Further, Ms. Branham's affidavit reiterates the trial testimony of Donna Lomax[15] regarding the fact Petitioner was in a car accident in 1984 in which the car he was driving

> . . . .collided with another object, killing a female passenger in his vehicle. Our mother told me that Donald's head impacted the windshield and possibly went through it during the accident. Donald was approximately fifteen years old at the time. Emotionally, I do not believe he ever got over the accident. The young girl who was killed was from Van Buren, Arkansas. I believe the people of the town blamed Donald for the girl's death. He had a very hard time dealing with the death of his friend and the town's reaction. he (sic) did not seem to know how to deal with what he was going through. He would not talk about the accident with any of the family. He kept to himself and did not show much emotion. Our mother, again, protected and defended Donald from any responsibility. I suggested that Donald should get some help in dealing with the accident. Our mother said, "No child of mine will ever see a counselor," and the issue was never talked about again.

*Id.*, at ¶ 5. Petitioner was a very athletic individual in high school and he participated in wrestling, baseball and football. Petitioner also enjoyed riding motorcycles while driving in a very reckless manner. Petitioner had numerous accidents on his bicycle and motorcycle. *Id.*, at ¶ 6. Finally, Ms. Branham recounts a history of alcohol and drug abuse by Petitioner beginning when he was thirteen. Petitioner began using steroids when he was fifteen or sixteen and Ms. Branham states: "While Donald was using steroids his temper was uncontrollable, Donald would turn red in the face and I would become scared and leave the house." *Id.*, at ¶ 7. Finally, Ms. Branham states: "In late 1994 Donald began using methamphetamine, I witnessed Donald having syringes in his possession around the early spring of 1996." *Id.*

---

[15]*See* Donna Lomax's trial testimony, J.T.Tr. at pp. 537 - 339.

Petitioner also submits an affidavit of Tammy Standfird. App. VI, Exhibit I. Ms. Standfird indicates she attended school with Petitioner in Van Buren Arkansas. Ms. Standfird reveals she was in a relationship with Petitioner and she knew he "abused both alcohol and marijuana while we attended the same school." She also knew he used steroids and speed. According to Ms. Standfird's affidavit, however, if she had been called to testify she would have described Petitioner's "temper as very short and this was amplified by his abuse of alcohol and drugs." *Id*., at ¶ 3. Ms. Standfird indicates she "know[s] this by his abusive actions toward me during our relationship." *Id*. Further, Ms. Standfird would have advised the jury that Petitioner "was under a great deal of emotional pressure as the people of Van Buren held him responsible for the death of a young lady that died as a result of a motor vehicle accident in which [Petitioner] was the driver." *Id*. Finally, Ms. Standfird indicates Petitioner, on at least four occasions, stated he would be better off dead and on one of these occasions Petitioner had a firearm with which he threatened harm to himself. *Id*., at ¶ 4.

Further, Petitioner submits an affidavit from Robert Marquette, an Arkansas defense attorney who had represented Petitioner on "several occasions as a Public Defender and as a private attorney since 1984." App. VI, Exh. J. Mr. Marquette states Petitioner was an "amiable and kind person" until he became involved with his wife, Michelle, and drugs; at which point Petitioner became "totally different in that he became paranoid and antagonistic." App. VI, Exh. J. Further, Mr. Marquette indicates "Michelle was a domineering person and had a real influence on [petitioner]." *Id*. Despite the evidence

during the first stage of trial and Ms. Colleen Parker's testimony in the second stage of trial, Mr. Marquette indicates "[Petitioner] would not do something evil or mean. He sometimes made mistakes, but always took responsibility for those things."

Finally, Petitioner submits an affidavit from Donna Lomax, Petitioner's older step-sister.[16] App. VI, Exh. O. Ms. Lomax indicates she lived at home with her parents and siblings until she graduated from high school, at which time Petitioner was about ten years old. After she left home, Ms. Lomax' contact with Petitioner was limited, but she learned about problems Petitioner was encountering from other family members. Ms. Lomas reveals Petitioner was a poor student and didn't seem to apply himself. Petitioner hated moving to Van Buren, Arkansas and began abusing alcohol and experimenting with drugs at the age of thirteen. As he was growing up, Petitioner's care was mainly provided by family members. Punishment in the home was handled mainly by Petitioner's step-father; but Petitioner seemed to be punished less than the other children as his mother would intervene. Ms. Lomax indicates Petitioner was always getting into trouble and he was taught by his parents "that the rules did not apply to him." *Id.*, at ¶ 6. According to her affidavit, Ms. Lomax would have testified that Petitioner "has a very short temper and would go from happy to a rage in a matter of seconds. The change would take place so quickly that I could hardly believe what I saw. He demonstrated self destructive behavior by driving fast, living fast, and by putting himself into bad situations." *Id.* While admitting Petitioner's mother was never treated for any mental disorder, Ms. Lomax indicates "[t]he only family history of

---

[16]*See*, Trial testimony of Donna Lomax, J.T.Tr. at p. 538 and Trial testimony of Diana Branham, *id.*, at p. 542.

mental problems I am aware of involved our mother." *Id.*, at ¶ 7. Ms. Lomax states the relationship between her mother and Petitioner was, in her opinion, very dysfunctional and reveals her mother suffered "a rather deep depression for at least a year following the death of our sister Valerie." *Id.* Further, Ms. Lomax indicates Petitioner had a lot of little jobs as an adolescent, but as an adult Petitioner would only stick with jobs where he had minimal supervision. Petitioner was continually fired for being late to work or failing to follow directions. Finally, Ms. Lomax indicates Petitioner "tried to join the military, but was denied because he had no high school diploma or G.E.D."[17]

While all of this evidence may have taken more time for the jury to hear, this Court is convinced, when weighing the totality of all available mitigating evidence against the evidence in aggravation, there is no reasonable probability the jury would have spared Petitioner's life. The strength of the state's case on the question of guilt was extremely strong, including Petitioner's own confession to committing this crime. Additionally, the extent of participation by Petitioner in the murder and robbery of the victim undermines Petitioner's mitigating testimony that he was somehow controlled by his wife, Michelle, as suggested by the neuropsychological report and the affidavit of Robert Marquette. The testimony leaves no doubt Petitioner discussed and planned the robbery and murder the night before searching for a random victim. Then, Petitioner shot the victim seven to eleven times

---

[17]The Petition filed herein indicates Petitioner graduated from high school. *See*, Petition at p. 19. The Neuropsychological Report indicates Petitioner did not graduate from high school "because of incomplete credit hours. He obtained his GED in 1989. His scores were in the average range overall except that his Literature score was below average. Donald was admitted to the Spartan School of Aeronautics in the fall of 1989, but was suspended in March of 1990 due to poor academic performance. Teacher reports indicate his classroom behavior was unprofessional and he had excessive tardies." App. VI, Exhibit M at p. 3.

in the head, back, chest, arm, wrist and hand  because he needed money for drugs.  Just two days after the murder, Petitioner pawned the fishing reels and it was Petitioner who kept and moved the rest of the victim's stolen fishing equipment into his new apartment.  Further, the evidence of Petitioner's role in the Webbers Falls robbery just nine (9) days after this brutal and senseless murder would have left no doubt in the jury's mind that Petitioner was not being controlled and domineered by his wife, Michelle.

Further, the evidence now submitted to establish Petitioner:  1) may have suffered head trauma at birth, during an automobile accident when he was 14 or 15 years old, and/or during boxing; 2) did not make good grades in school; 3) held down a lot of little jobs as an adolescent, but as an adult could not hold down a job; 4) began abusing drugs and/or alcohol at the age of thirteen; 5) threatened to harm himself or commit suicide, as an adolescent, if he didn't get his way; and 6) was a loving child who was spared punishment because the rules did not apply to him, seems insignificant in terms of its mitigating effect in this case.  Unlike the facts in *Wiggins, supra, Williams*, *supra*, and *Anderson, supra*, nothing with Petitioner's neuropsychological evaluation indicates Petitioner was predisposed to commit such horrific crimes or was less morally culpable than the average defendant.  Rather, testing placed Petitioner in the average range of verbal intelligence and above average range of nonverbal intelligence, with superior ability in reasoning skills and memory ability; he completed the twelfth grade and earned his GED following high school making an average score overall except in literature where he scored below average; he obtained an "Average" full scale IQ score of 107 on the Weschler Adult Intelligence Survey (WAIS-III).  Further,

Petitioner was raised by hard-working parents who did not have any psychiatric,[18] drug or alcohol problems and nothing suggests Petitioner was ever abused or neglected as a child.

Additionally, the additional mitigating evidence would have given the jury more aggravating evidence of Petitioner's continuing threat to society since Petitioner was portrayed by family and friends as having a very short temper which manifested itself in abusive actions toward others. The fact Petitioner's drug addiction may have been more severe than portrayed to the jury does not diminish the evidence which was presented to the jury that the robbery and murder were committed to obtain money to buy drugs. Finally, no additional testimony was needed for the jury to realize the Petitioner was loved by his family and his execution would have a devastating effect upon them, a fact emphasized by trial counsel's closing argument.[19] Accordingly, this Court finds Petitioner has failed to establish counsel's performance prejudiced his defense. Therefore, pursuant to *Strickland*, habeas relief is not warranted.

## B. Failure to adequately voir dire potential jurors

Next, Petitioner argues defense counsel were ineffective because they failed to adequately question prospective jurors concerning whether they would automatically impose a death sentence upon finding Petitioner guilty of premeditated murder. Petitioner also alleges trial counsel was ineffective for failing to challenge Jurors Sumoeter and Stuart for

---

[18]Although Petitioner's step-sister, Donna Lomax, would, unlike her trial testimony, try to shift the blame for Petitioner's actions to his mother having mental problems, Petitioner reported no such problems to Dr. Ozolins. Furthermore, the jury was not swayed by Lomax's trial testimony that Petitioner had killed a person in an automobile accident as a teenager but was never forced to accept responsibility by his parents.

[19]*See*, J.T.Tr., at pp. 557 - 558.

cause based upon a single answer they gave to one question from defense counsel. Petitioner asserts the isolated responses of each of these two jurors would have been sufficient to challenge both of them for cause and, if challenged, it would have been constitutional error for the court not to have removed them for cause.

In addition to his Sixth Amendment rights to effective assistance of counsel, Petitioner contends he was deprived of a fair and impartial jury as required by the Fourteenth Amendment and of a reliable and fair sentencing proceeding. *See*, Ground Five of Petition for Habeas Corpus, at pp. 81-84. Specifically, Petitioner alleges six prospective jurors (Robertson, Pendergrass, Lindamen, Stuart, Sumeuter, and Harvey) should have *sua sponte* been removed for cause because their views on the death penalty prevented them from considering any punishment option besides death.

In rejecting each of these claims,[20] the Oklahoma Court of Criminal Appeals held:

> [Petitioner] argues in his eleventh proposition that his constitutional rights were violated by the trial court's failure to remove, sua sponte, jurors who would automatically vote for the death penalty. He specifically complains that six jurors should have been removed for cause when they indicated that they were unable to consider fairly the lesser penalties of life and life without the possibility of parole. This court has held that "[i]t is the duty of counsel to examine jurors on voir dire. Counsel then must discover any facts affecting their qualifications and then reasonably raise any objection that might exist as to any member of the panel." *Tate v. State*, 1995 OK CR 24, 896 P.2d 1182, 1191. Failure to do so waives all but plain error. *Id.* However, this Court has also held that "[t]he failure of the trial court to remove a prospective juror who unequivocally states that he is unwilling to follow the

---

[20] Since these claims overlap, this Court has set forth the Oklahoma Court of Criminal Appeals findings relating both to ineffective assistance of counsel and impartiality of the jury together. This Court's legal analysis dealing with Petitioner's claims that he was deprived of a fair and impartial jury, however, will be discussed in more detail in paragraph VIII herein.

law during the penalty phase by considering a life sentence is error." *Ross v. State*, 1986 OK CR 49, 717 P.2d 117, 120, *cert. granted*, 482 U.S. 926, 107 S.Ct. 3209, 96 L.Ed.2d 696 (1987).

Of the six potential jurors at issue, four were removed by the defense through the exercise of peremptory challenges and only two, Jurors Sumoeter and Stuart, remained on the jury. [Petitioner] cannot complain about the four potential jurors who did not sit on the jury. *See Tate*, 1995 OK CR 24, at ¶ 34, 896 P.2d at 1191. Further, he has failed to show how the use of his peremptory challenges on these four potential jurors prejudiced him. *Id.*

As to the remaining jurors, Sumoeter and Stuart, the record reveals that while each of these jurors expressed a clear ability to vote for the death penalty, they did not express that this was the only punishment option they would consider. Mrs. Sumoeter stated that she could consider the full range of punishment; life, life without the possibility of parole and death. She also mentioned that she had written a college research paper on capital punishment and she believed the death penalty to be applicable in some cases but she would consider all three punishment options based upon the evidence. Mrs. Stuart stated that she could consider the full range of punishment and listen to mitigating evidence. As neither of these potential jurors unequivocally stated that she was unwilling to follow the law during the penalty phase by considering any penalty other than death, the trial court cannot be found to have erred in not removing them for cause.

*Wackerly v. State*, 12 P.3d 1, 8 (Okla. Crim. App. 2000) (footnotes omitted).

In addressing Petitioner's ineffective assistance of counsel claims relating to these jurors, the state court held:

[Petitioner] first complains that defense counsel was ineffective for failing to inquire whether ten of the twelve jurors seated would automatically impose the death penalty. The record reflects that the jurors were asked whether they could consider all three possible punishments for first degree murder. It is true that defense counsel could have pursued this further and asked each potential juror if they would automatically impose the death penalty. *See Jones v. State*, 1999 OK CR 8, ¶ 2, 990 P.2d 247, 249. While counsel did not ask this specific question he did ask a variety of other questions designed to garner from the jurors their opinions regarding the death penalty. Accordingly, on this issue we decline to find that defense counsel's performance was deficient.

[Petitioner] also argues that defense counsel was deficient for failing to ask that two jurors who were partial to the death penalty be removed for cause. In Proposition XI [Petitioner] complained that Jurors Sumoeter and Stuart were not dismissed for cause. We noted that while each of these jurors expressed a clear ability to vote for the death penalty, they did not express that this was the only punishment option they would consider. We found that because neither of these potential jurors unequivocally stated that she was unwilling to follow the law during the penalty phase by considering any penalty other than death, the trial court did not err in failing to remove them for cause. As [Petitioner] was not entitled to have these two jurors removed for cause, defense counsel cannot be found deficient for failing to request such removal.

*Wackerly v. State*, *supra*, at pp. 12-13.

The Tenth Circuit has consistently held that "[a]n attorney's actions during voir dire are considered to be matters of trial strategy." *Neill v.* Gibson, 278 F.3d 1044, 1055 (10th Cir. 2001) and cases cited therein. Consequently, claims of ineffective assistance of counsel during voir dire will not succeed "unless counsel's decision is shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir.1997).

Although the Supreme Court has held in a capital trial that due process requires a voir dire examination of a potential juror's views on the death penalty, *see Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), it has also stated that the Constitution "does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Id.* Thus, counsel cannot be deemed ineffective if the entire voir dire process was adequate to ensure the defendant's right to a fair trial. A review of the record indicates defense counsel asked jurors questions designed to illicit their understanding of the difference between life without the possibility of parole and life, whether they could decline to impose the death penalty if they felt it was not

appropriate, whether anyone had any law enforcement experience or had any relatives, friends, or neighbors who were in law enforcement, whether the jurors would be able to follow the instructions even if they felt the law was unfair, whether anyone felt the granting of immunity to a witness for their testimony might affect the witness' testimony, and whether, if they were sitting in petitioner's position, was there anything about themselves that if counsel knew would be reason for them not to sit on the jury. J.T. Tr., at pp. 82- 94. Additionally, defense counsel asked jurors how long they had held their beliefs on the death penalty and, in some instances, had individual jurors expand upon their beliefs. *Id.*, at pp. 158-167. Counsel also asked the jurors whether they could consider mitigation evidence and explained to the jury what mitigation evidence was. Then, counsel asked jurors if they found that the murder was planned would they be inclined to give the death penalty, no matter what. *Id.*, at pp. 167-170. Furthermore, the court and prosecutor thoroughly questioned the jurors about their ability to consider all three punishment options if the petitioner was found guilty of first degree murder. None of the answers by any of the jurors who actually served on Petitioner's jury indicated they would automatically vote for death. *See*, J.T.Tr., at pp. 1-204. Petitioner has simply failed to establish that counsel's questioning of the jurors during voir dire was constitutionally deficient or prejudicial.

Additionally, even though Petitioner alleges that Jurors Sumoeter and Stuart indicated they would be more inclined to vote for death than not, the answers cited by Petitioner are limited to one response to a single question by defense counsel. When the totality of questions posed to each of these jurors are considered, it is clear both were willing to consider all three punishment options depending on the particular facts of the case. *See*, J.T.Tr., at pp. 104, 125-130, and 167-170. Petitioner has simply failed to rebut the factual

findings of the Oklahoma Court of Criminal Appeals regarding Jurors Sumoeter and Stuart's lack of bias. Since neither of these jurors were biased towards capital punishment, this Court finds counsel was not ineffective for failing to challenge them for cause. Therefore, this Court finds the Oklahoma Court of Criminal Appeals adjudication of these claims was neither contrary to, nor an unreasonable application of *Strickland* to the facts of this case. Accordingly, pursuant to 28 U.S.C. § 2254(d), Petitioner is not entitled to relief on this issue.

## VI. "CONTINUING THREAT" AGGRAVATOR

In his second proposition, Petitioner argues his death sentence was imposed in violation of his Eighth and Fourteenth amendment rights because the evidence was insufficient to support the continuing threat aggravating circumstance. Additionally, relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),[21] Petitioner alleges allowing the prosecution to rely on unadjudicated crimes violated his rights under the Sixth and Fourteenth Amendments. In his third proposition, Petitioner also argues the "continuing threat" aggravating circumstance is unconstitutionally vague.

Respondent asserts Petitioner has failed to exhaust any Sixth Amendment claim based on *Apprendi* and, therefore, pursuant to *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), the petition should be dismissed. Alternatively, Respondent urges the denial of the unexhausted claim on the merits, pursuant to 28 U.S.C. § 2254(b)(2). As to Petitioner's insufficiency of evidence and constitutionality arguments, Respondent argues

---

[21]*Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.*, at U.S. 490, S.Ct. 2348.

Petitioner has failed to establish the Oklahoma Court of Criminal Appeals resolution of these issues is contrary to, or an unreasonable application of Supreme Court precedent to the facts of this case.

## A. Constitutionality of the Continuing Threat Aggravator

Petitioner asserts both the statutory definitions in 21 O.S. § 701.12 and the jury instructions derived from this statute are unconstitutionally vague. In essence, Petitioner argues Oklahoma's continuing threat aggravator is unconstitutional as applied in Oklahoma for several reasons. First, because it fails to narrow the class of crimes and defendants eligible for the death penalty. Second, Petitioner claims the aggravator has become such a "catch-all" phrase that Oklahoma juries have virtually unlimited discretion to find the existence of the aggravator. Finally, Petitioner challenges the Oklahoma uniform jury instructions relating to this aggravator because, as Petitioner states, it is "a logical impossibility" for a jury to find a "probability" beyond a reasonable doubt. Respondent counters by arguing that the Oklahoma appellate court's rejection of this claim is consistent with applicable Supreme Court precedent. In rejecting each of Petitioner's claims, the Oklahoma Court of Criminal Appeals emphasized that "[t]he argument that the continuing threat aggravating circumstance is vague and overbroad has been consistently rejected by this Court. . . . . . We will not depart from this holding at this time." *Wackerly*, *supra,* at p. 16.

Oklahoma's "continuing threat" aggravating factor authorizes the imposition of the death penalty if the jury finds "the existence of a probability that the defendant would

commit criminal acts of violence that would constitute a continuing threat to society."[22] The

Tenth Circuit Court of Appeals has consistently held the continuing threat factor used in the

Oklahoma's statutory sentencing scheme is constitutional. *Nguyen v. Reynolds,* 131 F.3d

1340, 1352-54 (10th Cir. 1997), *cert. denied,* 525 U.S. 852, 119 S.Ct. 128, 142 L.Ed.2d 103

(1998). See also, *Ross v. Ward,* 165 F.3d 793, 800 (10th Cir. 1999) (citing *Castro v. Ward,*

138 F.3d 810, 816 (10th Cir.), *cert. denied,* 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343

(1998) and *Nguyen*, *supra*) and *Fowler v. Ward*, 200 F.3d 1302, 1313 (10th Cir. 2000). To

the extent Petitioner has cited no new authority or compelling arguments, this Court finds this

claim has no merit. Accordingly, it is denied.

## B. Sufficiency of evidence

First, Petitioner alleges the Webbers Falls robbery lacked "any indicia of reliability

and should not have been admitted;" the State was not required to prove Petitioner's

commission of this robbery beyond a reasonable doubt, in violation of *Apprendi*; and the fact

of the crime itself was insufficient to establish Petitioner was a "continuing threat" to

society. Petitioner bases these arguments primarily upon his assertion that there should be

a *per se* ban on unadjudicated crimes evidence in second-stage proceedings.

In rejecting these claims, the Oklahoma Court of Criminal Appeals stated:

To support this aggravator, the State must present evidence showing the
defendant's behavior demonstrated a threat to society and a probability that
threat would continue to exist in the future. This Court has held that prior
unadjudicated acts of violent conduct are relevant to the determination of

[22]See also OKLA. STAT. tit. 21, § 701.12(7).

whether a defendant is likely to commit future acts of violence that would constitute a continuing threat to society. Evidence of the callous nature of the crime and a defendant's blatant disregard for the importance of human life has been held sufficient to support this aggravating circumstance as well.

To support the alleged continuing threat aggravator in the present case, the State introduced evidence that [Petitioner] had committed an unadjudicated robbery of a convenience store in Webbers Falls. [Petitioner] acknowledges that this Court has long held that evidence of unadjudicated crimes is admissible to show that a defendant poses a continuing threat to society. However he urges this Court to depart from this established precedent . . . . [Petitioner] would have this Court ban the use of unadjudicated crimes to prove the continuing threat or, in the alternative, place restrictions on the use of such evidence. We decline to revisit this issue at this time.

*Wackerly*, *supra*, at 16 - 17 (citations omitted).

The United States Supreme Court held, in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *reh. denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), in a federal habeas proceeding challenging the sufficiency of the evidence in a state trial, a reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Further, the Court indicated following conviction, a judicial review of the "evidence is to be considered in the light most favorable to the prosecution." *Id.* In *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), *reh. denied*, 497 U.S. 1050, 111 S.Ct. 14, 111 L.Ed.2d 829 (1990), the Court held the standard of review set forth in *Jackson, supra*, was applicable in determining the sufficiency of evidence for aggravating circumstances.

The Tenth Circuit Court of Appeals has consistently held "consideration of evidence of unadjudicated crimes in imposing the death sentence does not violate a petitioner's due

process rights." *Williamson v. Ward*, 110 F.3d 1508, 1523 (10th Cir. 1997), citing *Hatch v. Oklahoma*, 58 F.3d 1447, 1465 (10th Cir. 1995). *See also*, *Hawkins v. Mullins*, 291 F.3d 658 (10th Cir. 2002) and *Smallwood v. Gibson*, 191 F.3d 1257, 1276 (10th Cir. 1999). Further, in *Hawkins*, the Tenth Circuit found *Apprendi* did not call into doubt the Court's prior decisions regarding the use of unadjudicated crimes because

> . . . . Oklahoma's capital sentencing procedure still requires the State to charge and prove to the jury beyond a reasonable doubt the existence of at least one aggravating factor. Okla. Stat. tit. 21, §§ 70, 701.12. Those requirements satisfy *Apprendi*. *See* 530 U.S. at 490, 120 S.Ct. 2348.

*Hawkins*, *supra* at p. 678. *See also*, *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (overruling *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), in favor of *Apprendi* - holding Sixth Amendment, as applied to the State's through the Fourteenth Amendment, required statutory aggravating circumstances be found to exist beyond a reasonable doubt by a jury).

Based upon the evidence detailed in this opinion, Petitioner has failed to establish that the Oklahoma Court of Criminal Appeals decision was unreasonable under 28 U.S.C. § 2254(d)(1) or (2). Since, the evidence overwhelming supported the jury's factual determination, habeas relief on this issue is denied.

## VII. "AVOID ARREST" AGGRAVATOR

Petitioner, in his fourth proposition, contends this aggravating circumstance is unconstitutionally broad as applied since it "encompasses any murder case in which another crime also takes place." Additionally, even though the jury found the existence of this

aggravating factor beyond a reasonable doubt, Petitioner asserts *Apprendi* required to the jury to specify the facts upon which it based its decision.[23] Finally, Petitioner claims the evidence was insufficient because the prosecutor failed to prove a predicate crime, separate from the murder, for which Petitioner sought to avoid arrest or prosecution or alternatively, the prosecution failed to prove Petitioner intended to commit murder to prevent or avoid a lawful arrest. Respondent again argues Petitioner has failed to show the Oklahoma Court of Criminal Appeals adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

## A. Constitutionality of "Avoid Arrest" Aggravator

Petitioner contends the murder to avoid arrest or prosecution aggravating circumstance is unconstitutionally broad as applied because it applies to any murder case in which another crime also takes place. The Oklahoma Court of Criminal Appeals followed prior state precedent holding the aggravator was "neither vague nor overbroad." *Wackerly, supra*, at p. 15.

In order to be constitutional, an aggravating circumstance must meet two requirements. *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994). First, it cannot apply to every defendant convicted of murder but must apply only to a subclass of defendants convicted of murder. *Id.* (citing *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993)). Second, it must not be

---

[23]For the same reasons *Apprendi* did not call into doubt the use of unadjudicated crimes evidence, it does not require the jury to specify the facts upon which it based its decision. Rather, the jury is only required to find the existence of any aggravating circumstances upon which it bases it decision to impose the death penalty beyond a reasonable doubt.

unconstitutionally vague.  *Tuilaepa*, *supra* (citing *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764-1765, 64 L.Ed.2d 398 (1980).

Oklahoma's "avoid arrest" aggravating factor authorizes the imposition of the death penalty if the jury finds "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution."[24]  In *Davis v. Executive Dir. of Dep't of Corrections*, 100 F.3d 750, 769-70 (10th Cir. 1996), *cert. denied*, *Davis v. Zavaras*, 520 U.S. 1215, 117 S.Ct. 1703, 137 L.Ed.2d 828 (1997), the Tenth Circuit upheld a similar aggravating circumstance in Colorado's statutes finding the aggravator sufficiently narrowed the class of defendants to whom it applied.  *See also*, *Wainwright v. Lockhart*, 80 F.3d 1226, 1231 (8th Cir. 1996), *cert. denied*, 519 U.S. 968, 117 S.Ct. 395, 136 L.Ed.2d 310 (1996) (holding similar Arkansas aggravator was properly applied to a murder which was committed in the course of a robbery, in order to prevent the murder's identification by the victim).

Under Oklahoma law, "the predicate crime for this aggravator must be separate and distinct from, rather than significantly contributing to, the murder."  *Harjo v. Gibson*, 216 F.3d 1087, *4 (10th Cir. 2000).  Thereafter, in *Boyd v. Ward*, 179 F.3d 904, 922-923 (10th Cir. 1999), the Tenth Circuit held instructing the jury in accordance with the statutory language of the aggravator meets constitutional standards.

In this case, the jury was given the following instruction:

AVOIDING LAWFUL ARREST OR PROSECUTION DEFINED

---

[24]OKLA. STAT. tit. 21, § 701.12(5).

The State has alleged that "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution." This aggravating circumstance is not established unless the State has proved beyond a reasonable doubt that:

First, there was another crime separate and distinct from the murder; and

Second, the defendant committed the murder with the intent to avoid being arrested or prosecuted for that crime.

Instr. No. 6, O.R. 268.

Based upon the record, this Court does not believe the Oklahoma appellate court's adjudication of this claim was contrary to federal law as determined by the Supreme Court since this aggravator sufficiently narrows the class of defendants to whom it applies. Additionally, this aggravating circumstance is not unconstitutionally vague but rather has a "common-sense core of meaning that criminal juries are fully capable of understanding." *See*, *Tuilaepa*, *supra*, U.S. at 973, S.Ct. at 2636 (quoting *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976) (White, J., concurring)). Accordingly, relief on this issue is denied.

**B. Sufficiency of the Evidence**

Under Oklahoma law, this aggravator focuses on the defendant's intent. A defendant's intent can be proven through a defendant's own statements. The defendant's intent must often be inferred from circumstantial evidence. *See*, *Smith v. State*, 932 P.2d 521, 536 (Okla. Crim. App. 1996), *cert. denied*, 521 U. S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997); *McGregor v. State*, 885 P.2d 1366, 1385 (Okla. Crim. App. 1994), *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Fox v. State*, 779 P.2d 562, 575 (Okla. Crim. App. 1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990). Furthermore, as previously indicated, the prosecution must establish that there was a predicate crime, other than the murder for which the defendant seeks to avoid arrest or prosecution. *Romano v. Gibson*, 278 F.3d 1145, 1154-1155 (10th Cir. 2002), citing *Romano v. Gibson*, 239 F.3d 1156, 1179 (10th Cir. 2001), *cert. den.* 534 U.S. 1045, 122 S.Ct. 624, 151 L.Ed.2d 545 (2001).

In addition to the uniform instruction defining the avoid arrest or prosecution aggravating circumstance, set forth in subsection VII(A) above, Petitioner's jury was provided with a uniform instruction regarding the use of circumstantial evidence during the second stage of proceedings which provided:

> DEATH PENALTY PROCEEDINGS - CIRCUMSTANTIAL EVIDENCE -
> EXCLUDING REASONABLE THEORIES OTHER THAN
> EXISTENCE OF AGGRAVATING CIRCUMSTANCE
>
> The State relies in part upon circumstantial evidence for proof of the aggravating circumstances of killing to prevent or avoid arrest or prosecution and, committing acts that would constitute a continuing threat to society. In

order to warrant a finding of any aggravating circumstance or circumstances upon circumstantial evidence, each fact necessary to prove the existence of the circumstance must be established by the evidence beyond a reasonable doubt. All the facts necessary to such proof must be consistent with each other and with the conclusion the State seeks to establish. All of the facts and circumstances, taken together, must be inconsistent with any reasonable theory or conclusion other than the existence of the aggravating circumstance. All of the facts and circumstances, taken together, must establish to your satisfaction the existence of the aggravating circumstance beyond a reasonable doubt.

Instr. No. 8, O.R. 270.

Since the State's evidence in support of the avoid arrest aggravator was completely circumstantial, Petitioner argues the instruction was erroneous and, therefore, the *Jackson* standard of review should not apply. As a general rule, improper jury instructions do not form the basis for federal habeas corpus relief. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Because the jury was free to consider direct evidence, as well as circumstantial evidence, this Court finds, where the state adopted of all of the evidence presented in the first stage of the trial during the second stage of trial, advising the jury that the state relied "in part" upon circumstantial evidence in proving this aggravating factor was not improper.

In upholding the sufficiency of the evidence to support this aggravating circumstance, the Oklahoma Court of Criminal Appeals found:

. . . . . this aggravating circumstance requires a predicate crime, separate from the murder, for which a defendant seeks to avoid arrest or prosecution. "Where such crimes are not separate and distinct from the murder itself, but rather significantly contribute to the death, they may not be used as a predicate crime for purposes of this aggravating circumstance." . . . .

The evidence presented at trial makes clear that [Petitioner] intended to commit a robbery and was prepared to kill to get the money he wanted.

Although the murder occurred contemporaneously with the robbery, we find it was separate and distinct from the robbery. The evidence in the present case was sufficient to support the jury's finding that the murder was committed to avoid lawful arrest or prosecution.

It is also argued that the State failed to prove beyond a reasonable doubt that [Petitioner] intended to commit murder for the purpose of preventing or avoiding lawful arrest. This Court has held that a defendant's intent is critical to a determination of whether he killed to avoid arrest or prosecution. We have further noted that "as in other areas of criminal law, the defendant's intent can be proved by circumstantial evidence. When the evidence relied upon to support this aggravating circumstance is entirely circumstantial, the evidence must exclude any reasonable hypothesis except that [Petitioner] murdered the decedent to avoid arrest or prosecution for the underlying robbery.

It is not clear from the facts of this case whether [Petitioner] intended to kill his victim to facilitate the robbery or whether he killed his victim to avoid arrest for the robbery. There is some circumstantial evidence that [Petitioner] was interested in avoiding detection for this crime. This is evinced by the testimony of Michelle Wackerly that after they parked by the victim's truck, [Petitioner] told her to go over the levy and see if there were any other people in the area. Because [Petitioner] did not disguise his identity, the victim could have identified him after the robbery. Accordingly, this Court finds that the evidence excludes every reasonable hypothesis except that [Petitioner] killed to avoid arrest.

*Wackerly*, *supra*, at 14-15.

Determinations of factual issues by a state court are presumed correct. 28 U.S.C. § 2254(e)(1). "A state court's finding of an aggravating circumstance in a particular case . . . is arbitrary or capricious if and only if no reasonable sentencer could have so concluded."

*Lewis v. Jeffers*, *supra*, U.S. at 783, S.Ct. at 3103.

Applying *Jackson* and *Lewis* to the facts of this case as set forth in detail throughout this opinion, this Court finds the determination by the Oklahoma Court of Criminal Appeals that there was sufficient evidence to support the "avoid arrest" aggravating circumstance is

not unreasonable but is entirely consistent with the evidence at trial. The evidence presented at trial not only provided the jury with a motive for the robbery, it established Petitioner's intent to kill if necessary to avoid arrest or prosecution for the robbery. Petitioner went to great lengths to avoid detection for the robbery, including searching for a vunerable isolated victim, dumping the victim's body in the back of the pickup, driving the victim's pickup to an even more remote location, and destroying or concealing some of the victim's personal property that would have linked Petitioner to the murder. Thus, taken in the light most favorable to the State, this Court finds Petitioner has failed to establish by clear and convincing evidence that the Oklahoma Court of Criminal Appeals decision was either contrary to federal law as determined by the Supreme Court or an unreasonable determination of the facts in light of the evidence presented. Accordingly, pursuant to 28 U.S.C. § 2254(d), habeas relief is denied.

## VIII. IMPARTIALITY OF JURY

Petitioner contends, in his fifth ground for relief, he was deprived of a fair and impartial jury as required by the Sixth and Fourteenth Amendments and of a reliable and fair sentencing proceeding. As indicated in paragraph V above, Petitioner asserts the trial court erred in failing to *sua sponte* remove for cause six prospective jurors (Robertson, Pendergrass, Lindamen, Stuart, Sumoeter and Harvey) prevented him from having a fair and impartial sentencing hearing. Respondent counters that the Oklahoma Court of Criminal Appeals rejection of this claim was neither contrary to, nor an unreasonable application of,

clearly established Supreme Court precedent to the facts of this case and, therefore, pursuant to 28 U.S.C. § 2254(d), habeas relief is unwarranted.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court indicated prospective jurors must be "willing to consider all of the penalties provided by state law." In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court clarified its decision in *Witherspoon* and reaffirmed the standard adopted by *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). Under that standard, the trial court must determine "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, *supra*, U.S. at 424, S.Ct. at 852. "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." *Sallahdin v. Gibson*, 275 F.3d 1211, 1224 (10th Cir. 2002) (quoting *United States v. Chanthadara*, 230 F.3d 1237, 1270 (10th Cir. 2000)). A trial judge's decision of a potential juror's bias is a factual finding which is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). *Davis v. Executive Dir. of Dep't of Corrections*, 100 F.3d 750, 777 (10th Cir. 1996), *cert. den.*, *Davis v. Zavaras*, 520 U.S. 1215, 117 S.Ct. 1703, 137 L.Ed.2d 828 (1997). *See also*, *Moore v. Gibson*, 195 F.3d 1152, 1168 (10th Cir. 1999), *cert. denied*, 530 U.S. 1208, 120 S.Ct. 2206, 147 L.Ed.2d 239 (2000) and *Coleman v. Brown*, 802 F.2d 1227, 1232 (10th Cir. 1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). Review of a trial judge's determinations regarding a juror's willingness and/or ability to follow the law as instructed

by the court is quite deferential since what is being inquired into is a state of mind which may turn largely on assessments of demeanor and credibility, matters peculiarly within the province of the trial judge. *United States v. Tipton*, 90 F.3d 861, 880 (4ᵗʰ Cir. 1996). Additionally, such credibility findings can not be easily discerned from an appellate record. *Wainwright v. Witt*, *supra*, U.S. at 429, S.Ct. at 854.

Claims that a jury was not impartial, however, must focus not on the jurors excused by peremptory challenge, but on the jurors who ultimately sat on the jury. *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988). As indicated in paragraph V above, a review of the trial court record reveals why Jurors Sumoeter and Stuart were not removable for cause. Specifically, Ms. Sumoeter stated on several occasions she would be able to consider all three punishment options depending upon the evidence. *See*, J.T.Tr. at pp. 99-100, 125-131, and 170. Similarly, Ms. Stuart not only indicated she could consider the full range of punishment options but also indicated a willingness to listen to all of the evidence presented during the penalty phase of trial. In fact, at one point during defense counsel's questioning, Ms. Stuart reacted the way many jurors new to the jury voir dire process react when asked questions in several different ways. However, it is clear from the totality of the questions asked and the responses given that Ms. Stuart would consider all of the evidence before deciding on an appropriate punishment. *See*, J.T.Tr. at pp. 104 and 166-169.

After reviewing the entire voir dire, this Court finds nothing within the record which indicates either of these jurors held views on capital punishment which would prevent or

substantially impair the performance of their duties as jurors in accordance with the instructions of the court and their oath as jurors. Therefore, this Court finds Petitioner has failed to establish that the decision of the Oklahoma Court of Criminal Appeals involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly, this claim is denied.

## IX.  SUFFICIENCY OF EVIDENCE

In Petitioner's sixth and seventh grounds for relief, he argues the evidence was insufficient to support his convictions. Arguing the Oklahoma Court of Criminal Appeals decision is reasonable in light of existing Supreme Court precedent, Respondent urges this Court to deny relief.

As indicated previously, in a federal habeas proceeding challenging the sufficiency of the evidence in a state trial, the reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Furthermore, following conviction, a judicial review of the "evidence is to be considered in the light most favorable to the prosecution." *Id.*

## A.  First Degree Murder

Petitioner first claims the evidence was insufficient to support a first degree murder conviction because no corroborating evidence was presented to support Michelle Wackerly's accomplice testimony. Respondent urges this Court to find the Oklahoma Court of Criminal Appeals adjudication of this claim reasonable in light of *Jackson*, *supra*.

In rejecting this issue on direct appeal, the Oklahoma Court of Criminal Appeals found:

> [Petitioner] argues that aside from Michelle Wackerly's testimony that he actually shot the victim, there is no evidence which linked him to the actual commission of the crime. He claims that all other evidence-evidence that Michelle knew where to find the fishing poles, evidence that he had pawned the fishing reels, evidence that he was found to possess the rifle and tackle box-merely raises a suspicion of his guilt. Assuming, arguendo, that none of this evidence standing alone would necessarily link [Petitioner] to the commission of the crime charged, there is other evidence which does. Curtis Jones testified that [Petitioner] told him what had happened. In reference to the victim in this case, [Petitioner] told Jones that "he was the one that did it." Although [Petitioner] argues that this testimony was too vague and unreliable to serve as adequate corroboration, we find it is sufficient independent evidence which links [Petitioner] to the commission of the crime charged. Hence, the evidence was sufficient to corroborate the accomplice's testimony.

*Wackerly v. State*, *supra* at 11 (footnotes omitted).

While Petitioner is correct that "[a] conviction unsupported by sufficient evidence cannot withstand Constitutional scrutiny even when rendered by a properly instructed jury," Pet. at p. 86, this Court "may not weigh conflicting evidence or consider the credibility of witnesses. Instead, [the Court] must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'" *Stallings v. Tansy*, 28 F.3d 1018, 1019 (10th Cir. 1994) (citations omitted).

Petitioner's chief complaint, however, is that the prosecution failed to comply with Oklahoma statutes regarding corroboration of accomplice testimony. *See* 22 Okla. Stat. Ann. § 742. This Court's role is to ascertain whether Petitioner's constitutional rights have been violated as opposed to ensuring compliance with state laws. *See* 28 U.S.C. § 2254(a). "'The Constitution does not prohibit convictions based primarily on accomplice testimony.' *Scrivner v. Tansy*, 68 F.3d 1234, 1239 (10th Cir. 1995), *cert. denied*, 516 U.S. 1178, 116 S.Ct. 1277, 134 L.Ed.2d 223 (1996)." *Foster v. Ward*, 182 F.3d 1177, 1193 (10th Cir. 1999). Since there is no constitutional requirement that Ms. Wackerly's testimony be corroborated, this Court need not address this claimed deprivation of protection under state law.

Based upon all of the evidence submitted at trial, which are set forth in detail in this opinion, this Court finds any reasonable jury would have found Petitioner guilty of first degree murder beyond a reasonable doubt. Although Petitioner's allegations regarding the truthfulness of Michelle Wackerly, because of her complete immunization from prosecution, and Curtis Jones testimony, because of his relationship to Michelle Wackerly, may have raised credibility questions for the jury, these issues were resolved by the jury. Accordingly, this Court finds the Oklahoma Court of Criminal Appeals resolution of this issue was not contrary to clearly established Federal Law, as determined by the Supreme Court of the United States. Further, the decision was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, this claim is denied.

## B. Robbery with a Firearm

Next, Petitioner claims the evidence was insufficient to convict him of robbery with a firearm as alleged in the information for two reasons. First, Petitioner reiterates his argument that the prosecution presented insufficient evidence to corroborate Michelle Wackerly's accomplice testimony. Petitioner further argues the proof at trial did not conform to the allegations made in the Information. Respondent simply asserts the appellate court's determination of this issue was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

In rejecting this issue on direct appeal, the Oklahoma Court of Criminal Appeals held:

> . . . . .[Petitioner] complains that the State failed to prove the crime of Robbery with a Firearm as alleged in the Information. The Information charged Petitioner with having committed the crime of robbery by having taken and carried away from the victim "[t]wo fishing reels and an unknown amount of money." [Petitioner] argues that although Michelle Wackerly testified that Petitioner had taken a wallet from the victim, she did not mention ever seeing any money taken by Petitioner. Petitioner fails to mention that the State did present evidence that he took from the victim two fishing reels as was alleged in the Information. Accordingly, there was no variance between the Information and the evidence presented at trial. This argument is without merit.

*Wackerly*, *supra*, at p. 11 (footnotes omitted).

Again, there is no constitutional requirement for Ms. Wackerly's testimony to be corroborated. Although no evidence was presented to establish Petitioner took an unknown amount of money from the victim, the evidence set forth herein, when viewed in the light most favorable to the government, established beyond a reasonable doubt that Petitioner stole the victim's fishing reels which he pawned two days after the murder at Rocky's Pawn Shop for sixty dollars ($60.00). Therefore, this Court finds the Oklahoma Court of Criminal

Appeals decision was both a reasonable application of *Jackson*, *supra*, and a reasonable determination of the facts based upon the evidence introduced at trial. Accordingly, pursuant to 28 U.S.C. § 2254(d), Petitioner is not entitled to relief on this issue.

## X. CUMULATIVE ERROR

In Petitioner's final ground for relief, he claims the accumulation of errors in this case denied him due process of law and a reliable sentencing hearing. Therefore, he alleges the Eighth and Fourteenth Amendments of the United States Constitution necessitate reversal. However, cumulative error analysis should only be implemented where there are two or more actual errors. See *United States v. Rivera*, 900 F.2d 1462, 1470-1471 (10th Cir. 1990)(holding that a cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors). Thus, cumulative error analysis does not apply to this case. See *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998), *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 362 (1999) and *Jackson v. Shanks*, 143 F.3d 1313 (10th Cir. 1998), *cert. denied*, 525 U.S. 950, 119 S.Ct. 378, 142 L.Ed.2d 312 (1998). Accordingly, this argument also lacks merit.

## XI. CONCLUSION

After a thorough review of the Petition for Writ of Habeas Corpus, the Respondent's Response, Petitioner's Reply, and the state court records filed herein, this court finds Petitioner has failed to establish that he is currently in custody in violation of the Constitution, laws or treaties of the United States as required by 28 U.S.C. § 2254(a). Therefore, for the reasons stated herein, Petitioner's Petition for Writ of Habeas Corpus

(Docket No. 19) is hereby denied.  Additionally, for the reasons set forth herein, Petitioner's request for an Evidentiary Hearing is denied.

**ACCORDINGLY IT IS HEREBY ORDERED THAT:**

1.  Marty Sirmons is substituted for Gary Gibson as the proper party Respondent and the Court Clerk is directed to note such substitution on the record.

2.  Petitioner's request for habeas relief (Dkt. No. 19) is denied.

3.  Petitioner's request for an evidentiary hearing, contained within his Petition, is denied.

**It is so ordered on this 27ᵗʰ day of March, 2007.**

Frank H. Seay
United States District Judge
Eastern District of Oklahoma